FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 10 2019

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS, WESTERN DIVISION

KIM BLACKSHIRE-LEE, as Special )
Administratrix of the Estate of Bradley )
Blackshire, Deceased )
 )
       Plaintiff, )
v. )
 )   4:19-cv-398-BRW
OFFICER CHARLES STARKS #34308, )   JURY TRIAL DEMANDED
OFFICER MICHAEL SIMPSON #36194, )
and THE CITY OF LITTLE ROCK )
 )
       Defendants. )

## COMPLAINT

Plaintiff, ESTATE OF BRADLEY BLACKSHIRE, by and through its special adminstratrix KIM BLACKSHIRE-LEE, complains of Defendants CHARLES STARKS, MICHAEL SIMPSON and THE CITY OF LITTLE ROCK as follows.

### INTRODUCTION

1. Former Little Rock Police Officer Charles Starks unlawfully killed Bradley Blackshire. During this tragic shooting, Defendant Starks stepped in front of the car Mr. Blackshire was sitting in and repeatedly shot him. Little Rock Police Officer Michael Simpson then confronted the fatally wounded Mr. Blackshire and, instead of rendering aid, shouted expletives at Mr. Blackshire as his life slipped away.

2. This shooting has caused residents of the City of Little Rock to experience a grim case of déjà vu. The Little Rock Police Department has a history of its officers shooting young men like Mr. Blackshire, including young black men sitting behind the wheels of cars that did not pose a threat to the shooting officers. These officers are protected and emboldened by a culture of impunity within the Department, a culture in which combative behavior and excessive force too often go unpunished, a culture of impunity that begot the unjustified death of Mr.

This case assigned to District Judge  Wilson
and to Magistrate Judge  Ray

1

Blackshire.

3. This action seeks accountability, justice and recognition that the wrong done to Mr. Blackshire was not just inexcusable; it was unlawful and unconstitutional.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

5. Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all or most of the parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred in Pulaski County, Arkansas.

## PARTIES

6. The Estate of Bradley Blackshire represents the property and legal interests of the decedent, Bradley Blackshire, who was a loving, giving thirty-year-old father of five and his mother's only son.

7. Kim Blackshire-Lee, the mother of Bradley Blackshire, is the court-appointed special administratrix of the Estate of Bradley Blackshire for the purpose of pursuing this litigation. The Estate includes any legal interests arising out of Mr. Blackshire's death that Kim Blackshire-Lee, Mr. Blackshire's siblings or his children may have. The Estate brings these claims on their behalf.

8. Defendant Charles Starks is a white Little Rock Police Department (LRPD) officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as an LRPD officer. Defendant Starks has worked as an LRPD officer since August 12, 2013.

9. Defendant Michael Simpson is an LRPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as an LRPD officer. Michael Simpson has worked as an LRPD officer since February 22, 2016.

10. Defendant City of Little Rock (the City) is an Arkansas municipal corporation that operates LRPD, which in turn sets city-wide policy for the conduct of police officers employed by LRPD. The City is an indemnification party for those liable for the acts of which Plaintiff complains.

11. The City is also a participant in the Municipal Legal Defense Program, which is also an indemnification party for the acts of which Plaintiff complains and the policies and practices of the City that caused said acts to occur.

## FACTUAL ALLEGATIONS

12. The events detailed below were video recorded.

### Bradley Blackshire Is Surreptitiously Targeted by LRPD and Defendant Starks

13. Mr. Blackshire borrowed a black Nissan Altima (the Altima) on February 22, 2019.

14. Around 11:00 a.m. that morning, Mr. Blackshire was traveling west on 12th Street in Little Rock when LRPD began to monitor the Altima with various cameras located along 12th Street.

15. Desaray Clarke was in the front passenger's seat of the Altima that morning.

16. Mr. Blackshire did not violate any traffic law as LRPD monitored him driving down 12th Street.

17. As Mr. Blackshire was driving, Defendant Starks and other LRPD police officers were made aware of the Altima, which LRPD suspected of being stolen.

18. None of the information reported to Defendant Starks or the other LRPD officers suggested the Altima was being driven in a dangerous, threatening manner or that its driver was engaged in any violent behavior.

19. Defendant Starks and other LRPD officers then indicated, via radio, that they intended to stop the Altima, unbeknownst to Mr. Blackshire.

20. At around 11:08 a.m., Mr. Blackshire turned into a parking lot located at 7305 Kanis Road in Little Rock and backed into a parking space.

21. Mr. Blackshire was not aware that the Altima was the target of an LRPD investigation at this time.

22. Instead of waiting for backup, which he knew was en route to the parking lot, Defendant Starks turned into the parking lot shortly after Mr. Blackshire drove into the lot.

**Defendant Starks Hastily Draws His Gun on the Unsuspecting Bradley Blackshire**

23. After entering the parking lot, Defendant Starks parked his SUV in front of the Altima, thereby blocking the Altima's most direct path out of the parking lot.

24. Defendant Starks immediately got out of the SUV, unholstered his gun and aimed it at Mr. Blackshire.

25. When he first confronted Mr. Blackshire, Defendant Starks had not observed Mr. Blackshire do anything unlawful or threatening.

26. Still, Defendant Starks repeatedly shouted orders at Mr. Blackshire, who, fearing for his life, asked: "What did I do?" Defendant Starks refused to answer this question.

27. Mr. Blackshire then asked Defendant Starks, "What you gonna shoot me for?"

28. Defendant Starks still did not advise Mr. Blackshire of why he was being detained at gun point.

29. The Altima then began to very slowly roll forward.

## Defendant Starks Kills Bradley Blackshire

30. Neither Mr. Blackshire nor the Altima posed a threat to Defendant Starks when the Altima began to very slowly roll forward.

31. Defendant Starks stood next to the driver's side fender of the Altima when it began to very slowly roll forward.

32. The Altima rolled so slowly that, after five seconds of movement, it had still not fully made its way out of the parking space it was in when it started moving.

33. Defendant Starks did not feel threatened.

34. Defendant Starks believed the Altima was moving very slowly so as to avoid contact with him.

35. Defendant Starks believed the Altima began moving because Mr. Blackshire wanted to leave the parking lot.

36. Defendant Starks did not have a reason to believe the very slowly rolling Altima posed a threat to anybody.

37. Defendant Starks had his gun aimed at Mr. Blackshire before and during the Altima's very slow movement.

38. Defendant Starks could see both of Mr. Blackshire's hands when the Altima started moving.

39. Defendant Starks could see both of Mr. Blackshire's hands as the Altima was moving.

40. Defendant Starks later stated that he did not see Mr. Blackshire violently digging his hands in his pockets.

41. Mr. Blackshire never brandished a weapon during his encounter with Defendant Starks.

42. Defendant Starks never saw Mr. Blackshire in possession of a weapon.

43. Defendant Starks never believed Mr. Blackshire possessed a weapon.

44. Defendant Starks never saw Mr. Blackshire reach for a gun or any other kind of weapon.

45. Defendant Starks never believed Mr. Blackshire reached for a gun or any other kind of weapon.

46. No reasonable person would have perceived the very slowly rolling Altima as threatening Defendant Starks or anyone else.

47. No reasonable person would have perceived Mr. Blackshire as threatening Defendant Starks or anyone else.

48. Nonetheless, Defendant Starks aimed his gun at Mr. Blackshire, leaned against the Altima and began shooting Mr. Blackshire with the intent to kill him.

49. The Altima then stopped as Defendant Starks continued to repeatedly shoot Mr. Blackshire.

50. Defendant Starks could see both of Mr. Blackshire's hands when the Altima came to a stop and thereafter.

51. Once the Altima stopped, Defendant Starks moved directly in front of the Altima and continued to repeatedly shoot Mr. Blackshire.

52. At this point, Defendant Starks believed that Mr. Blackshire was severely wounded from the multiple volleys of gunshots.

53. Defendant Starks then bent over the hood of the Altima and continued to repeatedly shoot Mr. Blackshire, who was unable to keep his foot on the brake of the Altima as his body convulsed with each bullet wound sustained.

54. Next, another LRPD officer, Defendant Simpson, drove into the parking lot and rammed the side of the Altima as Defendant Starks continued to repeatedly shoot Mr. Blackshire.

55. In so doing, Defendant Simpson knocked Defendant Starks to the ground.

**The Defendant Officers Fail to Provide Medical Care to Bradley Blackshire**

56. Once the Altima came to rest, Defendant Simpson noticed that Mr. Blackshire was losing consciousness.

57. Nonetheless, Defendant Simpson drew his gun on the dying Mr. Blackshire and repeatedly yelled at him, shouting, "Put your fuckin' hands up!"

58. Mr. Blackshire continued to bleed profusely through several gunshot wounds.

59. Neither of the Defendant Officers provided medical care to Mr. Blackshire.

60. Moreover, the Defendant Officers did not request emergency medical services to come to the parking lot until more than five minutes after Defendant Starks fired his last shot.

61. There was no just reason for the Defendant Officers' delay in requesting emergency medical services for Mr. Blackshire.

62. Mr. Blackshire appeared to be losing consciousness or unconscious during the Defendant Officers' more-than-five-minute delay in requesting emergency medical services.

63. As a result of the Defendant Officers' delay, no emergency medical service provider arrived at the parking lot, where Mr. Blackshire was mortally wounded, until over ten minutes after Defendant Starks fired his final shot.

64. Shortly after the emergency medical service provider finally arrived on the scene, Mr. Blackshire was pronounced dead.

### Defendant Starks Attempts to Cover-Up His Unlawful Shooting

65. Defendant Starks's accounting of events is contradicted by video footage of the shooting.

66. After the shooting, Defendant Starks falsely told authorities that Mr. Blackshire accelerated towards him and almost pinned him between the Altima and the barricading SUV.

67. Defendant Starks made this statement, before he learned about the video footage that contradicted his account, in an effort to make his unlawful actions appear justified.

68. Also, another LRPD officer on the scene instructed Defendant Simpson not to talk about the shooting in an attempt to conceal the Defendant Officers' unlawful actions.

### Prior to the Shooting, The City Disregarded a Lieutenant's Recommendations to Terminate Defendant Starks's Employment

69. Lieutenant Johnnie Gilbert, of the LRPD, advised the City to terminate Defendant Starks's employment in 2015; however, Defendant Starks's employment was not terminated.

70. Separately, in 2016, Lieutenant Gilbert again told the City that Defendant Starks's employment should be terminated because Defendant Starks gravitated towards conflict and was difficult to manage.

71. The City learned that Defendant Starks gravitated towards conflict and was difficult to manage from other sources, in addition to Lieutenant Gilbert, as well.

72. Still, the City did not terminate Defendant Starks's employment, despite these multiple credible recommendations to the contrary.

### The City's Policies, Practices and Customs Were the Moving Force Behind Defendants' Unlawful Actions

73. The City rarely, if ever, punishes LRPD officers for using excessive force.

74. LRPD has automated computer software, named Early Intervention System (EIS), that warns the department about LRPD officers' problematic uses of force.

8

75. The EIS flagged problem LRPD officers more than 700 times between July 2010 and the end of 2015, but only mandated interventions in two instances—both for the abuse of sick-leave policy.

76. This repeated, intentional refusal to intervene in problematic uses of force is pursuant to the City's deficient, unconstitutional policies, practices and customs of allowing police officers to use excessive force without consequence.

### The City's Failure to Discipline Officers Who Fire into Moving Vehicles Was a Moving Force Behind Defendants' Unlawful Actions

77. The City's formal policy prohibits LRPD officers from firing into moving vehicles unless the shooting officer or another person faces an imminent threat of great bodily harm.

78. Despite this formal policy, Mr. Blackshire is not the first man to be shot to death in a moving vehicle by an LRPD officer who did not face a threat of imminent bodily harm.

79. For example, in 2007, two LRPD officers fired fourteen shots into the side of a truck, thereby striking a passenger in the car. These officers then later falsely claimed the truck was driving at them when they fired into it. One of the officers' bullets even damaged the bathroom of a nearby home. These actions were deemed justified by the LRPD, which imposed no discipline, did not require any additional training and took no form of corrective action.

80. In 2011, LRPD Officer Chris Johannes shot a driver and a passenger of a car, later claiming that the victim tried to run him over; however, the front of car did not have any bullet holes after the shooting. The victims refuted Johannes's account. Johannes' actions were deemed justified by the LRPD, which imposed no discipline, did not require any additional training and took no form of corrective action.

9

81. In 2005, four LRPD officers fired forty-three shots into a moving car that was allegedly reported stolen, striking the driver in the process. These actions were deemed justified by the LRPD, which imposed no discipline, did not require any additional training and took no form of corrective action.

82. In 2010, LRPD Officer Arthur McDaniel fired into a car as it attempted to drive around him, killing an unarmed driver and seriously wounding an unarmed passenger in the process. McDaniel fired his weapon sixteen times during this incident. McDaniel's actions were deemed justified by the LRPD, which imposed no discipline, did not require any additional training and took no form of corrective action.

83. In 2017, LRPD Officer Brittany Gunn fatally shot James Hartsfield, who was unarmed, during a DWI traffic stop in a parking lot, while Mr. Hartsfield was still in the car. Ms. Gunn's actions were deemed justified by the LRPD, which imposed no discipline, did not require any additional training and took no form of corrective action.

84. Also in 2017, LRPD Officer Ralph Breshears discharged his weapon into a moving car in a parking lot, wounding Rudy Leonard Avila in the process. These actions were deemed justified by the LRPD, which imposed no discipline, did not require any additional training and took no form of corrective action. Indeed, this shooting also should have never happened because Breshears had been previously been terminated by LRPD in 2003 for putting false information related to a false arrest in a police report. The City subsequently reinstated Breshears's employment in 2005.

85. In 2012, then-LRPD Officer Josh Hastings fired his weapon into a moving car, thereby killing a 15-year-old-black child named Bobby Moore. At the time, the City knew that Hastings was a potential liability, in part because he was labeled as such by Lieutenant Gilbert,

who cautioned the City against hiring Hastings. Prior to shooting little Bobby, Hastings had been subjected to administrative interventions arising out of his uses of excessive force, but was nevertheless allowed to stay on the job.

86. In 2013, Deon Williams, like Mr. Blackshire, was shot to death by an LRPD Officer, Terry McDaniel, who suspected Mr. Williams of unlawfully possessing a stolen vehicle. Mr. Williams never posed a threat to McDaniel or anyone else during this incident.

87. Despite formally prohibiting officers from shooting into moving vehicles, LRPD rarely, if ever, punishes officers for violating this policy.

### The City's Policy Permitting Officers to Barricade Vehicles During Traffic Stops Was a Moving Force Behind Defendants' Unlawful Actions

88. Prior to Mr. Blackshire's death, there had been three officer-involved shootings since 2015 in which the shooting officer barricaded the victim's car before shooting the victim; two of these shootings were fatal.

89. Before Defendant Starks killed Mr. Blackshire, the City knew that its policy of allowing officers to box in unaware suspects operating vehicles almost guaranteed an officer-involved shooting.

90. An LRPD lieutenant has since confirmed the City's knowledge by stating, in writing, that the City's policy of allowing officers to "box in unaware suspects operating vehicles" poses a risk to bystanders and officers and "almost guarantees an officer involved shooting."

91. This policy permitting officers to barricade cars allowed Defendant Starks to barricade the Altima before killing Mr. Blackshire.

92. Referring to the shooting of Mr. Blackshire, this lieutenant concluded: "I believe that if Officer Starks had not been able to block the Nissan [Altima] and he knew there was a

11

possibility the Nissan could be driven right in front of his unit while fleeing he would never have gone to the driver's side door like he did."

93. Nonetheless, the City has done nothing to change this policy.

94. This LRPD lieutenant also explained that LRPD officers need training regarding how to avoid escalating traffic stops.

95. The LRPD knew of the need to provide training on how to avoid escalating traffic stops well before Defendant Starks killed Mr. Blackshire, but LRPD failed to provide this needed training anyway.

96. The City's failure to implement the obviously needed policy changes, disciplinary measures and supplemental training resulted in the unjustified and preventable killing of Mr. Blackshire.

## Plaintiff's Damages

97. The Defendants' actions caused Mr. Blackshire to suffer mightily as his body was riddled with bullets from Defendant Starks's gun and as Defendant Simpson rammed his SUV into the Altima and shouted expletives at the fatally wounded Mr. Blackshire.

98. The Defendants have deprived Mr. Blackshire, who was an able-bodied man in the prime of his life, of the opportunity to grow and improve as a provider for his family and supporter of his community.

99. As a result of the Defendants' fatal, unlawful actions, Mr. Blackshire will never again help his young children with their homework, he will never teach his son, his namesake, how to tie a tie and he will never walk his daughter, Leah, down the aisle.

100. In addition to the trauma of having lost their father to gun violence, Mr. Blackshire's children will one day undoubtedly see the grisly video of Defendant Starks repeatedly shooting their father.

101. Mr. Blackshire was Kim Blackshire-Lee's only son, and, because of Defendant Starks's brutal actions that fateful day, she will never again have that unique mother-son relationship; instead, she now has to shoulder the burden of filling the void Mr. Blackshire's early grief has left in her children's and grandchildren's lives.

### Count I – 42 U.S.C. § 1983
### Excessive Deadly Force

102. Plaintiff incorporates each of the paragraphs in this complaint by reference.

103. The Defendant Officers' uses of excessive force, as described above, violated Mr. Blackshire's constitutional rights, including, but not limited to, his Fourth Amendment protection against excessive force.

104. The Defendant Officers' objectively unreasonable conduct was undertaken with malice, willfulness and reckless indifference to the rights of others.

### Count II—42 U.S.C. § 1983
### Failure to Provide Medical Care

105. Plaintiff incorporates each of the paragraphs in this complaint by reference.

106. The Defendant Officers failed to provide Mr. Blackshire medical treatment after Defendant Starks's deadly barrage.

107. This failure to provide medical care after detaining Mr. Blackshire by shooting him in the chest and holding him at gun point violated Mr. Blackshire's rights under the Fourth Amendment and Fourteenth Amendments of the United States Constitution.

108. The misconduct described in this Count was objectively unreasonable and intentionally undertaken with willful indifference to Mr. Blackshire's constitutional rights.

## Count III—42 U.S.C. § 1983
## Municipal Liability: *Monell*

109. Plaintiff incorporates each of the paragraphs in this complaint by reference.

110. As a matter of policy and custom, the City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

111. As a matter of policy, the City has knowingly maintained a policy allowing LRPD officers to barricade suspected motorists' vehicles, despite the City's knowledge that these barricades inevitably lead officers to employ excessive deadly force.

112. As a matter of policy and custom, the City has knowingly failed to train its officers on how to determine: 1) whether to use force during a traffic stop or an investigation involving a motorist; 2) if necessary, the type and amount of force to use during a traffic stop or an investigation involving a motorist; and 3) when to render medical aid or request emergency medical service after using force against a motorist during a traffic stop.

113. As a result of these ignominious policies and customs, the City encourages police officers, like the Defendant Officers, to wantonly escalate uses of force, injuring and killing people like Mr. Blackshire in the process.

114. Also, as a matter of practice and custom, the City intentionally, persistently and customarily fails to adequately investigate or discipline officers for misconduct, especially misconduct involving the use excessive force.

115. As a matter of both policy and practice, the City facilitates the very type of misconduct alleged herein by failing to adequately investigate, punish and discipline prior instances of similar misconduct, thereby leading LRPD officers to believe their errant actions

will never be meaningfully scrutinized. Accordingly, the City directly encourages future uses of excessive deadly force, unlawful detention and failures to intervene.

116. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, LRPD officers violate the constitutional rights of individuals in a manner similar to that alleged herein on a regular basis, yet LRPD investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases.

117. As a result, officers like and including the Defendant Officers feel free to use deadly force in the absence of viable system of accountability, injuring and killing people like Mr. Blackshire in the process.

## Count IV—State Law Claim
## Violation of Arkansas Civil Rights Act

118. Plaintiff incorporates each of the paragraphs in this complaint by reference.

119. The Defendant Officers' actions, as described above, violated the Arkansas Civil Rights Act and Mr. Blackshire's rights under the Arkansas State Constitution, including his protection against excessive force, right to medical care and right to equal protection.

## Count V—State Law Claim
## Assault & Battery

120. Plaintiff incorporates each of the paragraphs in this complaint by reference.

121. The Defendant Officers drew their guns on Mr. Blackshire, thereby intentionally causing Mr. Blackshire to feel imminent apprehension of harmful and offensive contact.

122. The Defendant Officers' uses of force against Mr. Blackshire were intended to cause harmful and offensive contact and the imminent apprehension thereof.

123. Mr. Blackshire suffered severe emotional distress and physical pain as a direct and proximate result of the Defendant Officers' assaultive and violent actions.

### Count VI—State Law Claim
### Wrongful Death

124. Plaintiff incorporates each of the paragraphs in this complaint by reference.

125. All Defendants are liable for damages arising from Defendant Starks's murderous conduct, which resulted Mr. Blackshire's death.

126. Mr. Blackshire's injuries and death were caused by the Defendant Officers' wrongful actions, neglect, carelessness and unskillfulness while both men were acting as agents of the City.

127. Mr. Blackshire's parents, Kim Blackshire-Lee and DeAngelo Lee, as well as his children, Tyrique, Bradley, Jr., Leah, Brandon and Royalty, are suffering from the loss of companionship and mental anguish caused by Mr. Blackshire's death.

128. These family members are also sustaining pecuniary losses arising out of Mr. Blackshire's death.

### Count VII—State Law Claim
### Survival Action

129. Plaintiff incorporates each of the paragraphs in this complaint by reference.

130. Plaintiff Kim Blackshire-Lee is the special administratrix authorized to pursue these claims against Defendants.

131. Prior to his death, Mr. Blackshire experienced severe pain and emotional distress from the moment Defendant Starks drew his gun until when Mr. Blackshire's lifeless body was unceremoniously placed on the pavement of the parking lot, riddled with bullets and left in the rain.

132. All Defendants are liable for these damages arising from the Defendant Officers' unlawful conduct, carelessness and default, which directly and proximately caused Mr. Blackshire to suffer severe pain and emotional distress.

### Count VIII—State Law Claim
### Intentional Infliction of Emotional Distress

133. Plaintiff incorporates each of the paragraphs in this complaint by reference.

134. Defendants intended to cause Mr. Blackshire emotional and physical distress by engaging in the aforementioned unlawful, violent and assaultive conduct.

135. The Defendant Officers' actions, all of which were intentional, were extreme and outrageous and caused Mr. Blackshire to experience severe emotional distress before his gruesome, untimely death.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants CHARLES STARKS, MICHAEL SIMPSON and THE CITY OF LITTLE ROCK and award compensatory damages and attorneys' fees, as well as punitive damages against CHARLES STARKS and MICHAEL SIMPSON. Plaintiff also requests equitable and injunctive relief against the CITY OF LITTLE ROCK and any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

*/s/ Omavi Shukur*
One of Plaintiff's Attorneys
Arkansas Bar No. 2016067

Arthur Loevy*
Jon Loevy*
David Owens*
Omavi Shukur
Loevy & Loevy
311 N. Aberdeen St, 3FL
Chicago, Illinois 60607
(312) 243-5900

*Motions for *Pro-Hac Vice*
Admission forthcoming