**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | |
|---|---|
| **BRITNEY WALLS, as Special Administrator** <br> **of the Estate of Bradley Berkshire, Deceased** | **PLAINTIFF** |
| **V.**      **NO. 4:19-cv-398-DPM** | |
| **CHARLES STARKS, Officer;** <br> **MICHAEL SIMPSON, Officer; and** <br> **CITY OF LITTLE ROCK** | **DEFENDANTS** |

## ORDER

Pending before the Court is a discovery dispute that has been referred to me

for resolution by Chief United States District Judge D. P. Marshall, Jr.  The matters

at issue are raised in the parties' Joint Report of Discovery Dispute, and the

accompanying attachments.  *Doc. 50.*

### I. BACKGROUND

On February 21, 2019, Defendant Charles Starks, a Little Rock Police Officer

("Officer Starks") fatally shot Bradley Blackshire ("Mr. Blackshire").  Defendant

Michael Simpson, another Little Rock Police Officer ("Officer Simpson"), was also

present.  Plaintiff Britney Walls ("Ms. Walls"), as Special Administrator of the

Estate of Mr. Blackshire, alleges that Officer Starks's use of deadly force was

unconstitutional. She alleges Officer Simpson failed to get timely and adequate

medical attention for Mr. Blackshire in violation of his constitutional rights.  Finally,

Ms. Walls asserts a *Monell*[1] claim against the City of Little Rock ("the City") and alleges that, both as enacted and as applied, its policies, practices, customs, and training related to how and against whom its police officers use deadly force are unconstitutional.

After Mr. Blackshire's death, it appears the Little Rock Police Department ("LRPD") authorized its Internal Affairs Division to conduct an investigation into whether Officer Starks's use of deadly force was justified. The officer responsible for conducting the investigation concluded that Officer Starks' use of deadly force violated LRPD policy.  Later, five ranking members in Officers Stark's chain of command – Assistant Chief Hayward Finks, Lt. Dana Jackson, Former Assistant Chief Alice Fulk, and an unidentified Sergeant – recommended that Officer Starks be "exonerated."  It is unclear to what extent, if any, these members of Officer Starks's chain of command conducted their own investigation.  Police Chief Keith Humphrey ("Chief Humphrey"), who was hired *after* Mr. Blackshire's death, made the decision to fire Officer Starks for his misconduct during the incident.  It is unclear whether Chief Humphrey based his decision on the results of the Internal Affairs Investigation or whether he conducted his own investigation.

---

[1] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Officer Starks appealed his termination to the Civil Service Commission, which upheld Chief Humphrey's decision.  Starks then appealed to Pulaski County Circuit Court.

On January 4, 2020, Pulaski County Circuit Judge Timothy Fox ("Judge Fox") concluded  that Officer Starks' use of deadly force against Mr. Blackshire "grossly deviated" from LRPD policy. Presumably, this was the *same conclusion* reached by Chief Humphrey and the Civil Service Commission, in deciding Officer Starks should be terminated.  However, Judge Fox went on to conclude that the Civil Service Commission erred in terminating Officer Starks for his misconduct. According to Judge Fox, Officer Starks was entitled to be reinstated, with the appropriate punishment being a 30-day suspension, without pay.  Shortly after he prevailed before Judge Fox, Officer Starks resigned from the LRPD; thereby mooting any appeal of Judge Fox's decision.

Finally, there are two pending civil lawsuits which are tangentially related to this case.  Assistant Chief of Police Hayward Finks, Lt. Duane Jackson, and Sgt. Reginald Parks have filed a lawsuit in Pulaski County Circuit Court against Chief Humphrey and the City in which they allege, among other things, that Finks suffered retaliation after he "testified in good faith" that: (1) "Charles Starks was denied rights under Arkansas Civil Rights Act;" and (2) the investigation into Mr. Blackshire's shooting was "rushed."  *Finks, et al. v. Humphrey*, et al., Pulaski County Circuit

Court Case No. 60CV-2718 (a copy of the Complaint is attached as Exhibit 1 to the

Joint Report).

Chief Humphrey later filed a lawsuit in United States District Court for the

Eastern District of Arkansas against Alice Fulk, Cristina Plummer, Hayward Finks,

Duane Finks, Reginald Parks, Little Rock Fraternal Order of Police, Lodge #17, and

others.  *Keith Humphrey v. Alice Fulk, et al.*, E.D. Ark. Case No. 4:20-cv-1158-JM,

Complaint, Doc. 1 at ¶ 39 (a copy of the Complaint is attached as Exhibit 2 to the

Joint Report).  In his almost one-hundred page Complaint, he alleges, among other

things, that one of his "first tasks" as police chief was to terminate Officer Starks

"who was videotaped violating LRPD policy during an avoidable police-involved

shooting that took the life of a black motorist."  Chief Humphrey also alleges that

his decision was met with a fierce backlash from the Little Rock Fraternal Order of

Police as well as H. FINKS and FULK, the two assistant chiefs who vied for the

same position of Chief of Police that eventually went to Chief Humphrey.

## II. DISCUSSION

### A.   The Broad Scope of Permissible Discovery Under Rule 26

Rule 26(b) of the Federal Rules of Civil Procedure authorizes parties to pursue

*broad discovery* to develop the facts supporting their respective claims and defenses:

> Parties may obtain discovery regarding any nonprivileged matter that
> is relevant to any party's claim or defense and proportional to the needs
> of the case, considering the [1] importance of the issues at stake in the
> action, [2] the amount in controversy, [3] the parties' relative access to

relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

"Broad discovery is an important tool for the litigant, and so '[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1039 (8th Cir. 2011) (alteration in original) (quoting Fed. R. Civ. P. 26(b)(1)).  The "broad scope of discovery applies to depositions[.]" *Pucket v. Hot Springs Sch. Dist.* No. 23–2, 239 F.R.D. 572, 579 (D. S.D. 2006); *see also Credit Lyonnais*, S.*A. v. SGC Int'l*, *Inc*., 160 F.3d 428, 430 (8th Cir. 1998) ("The rules for depositions and discovery 'are to be accorded a broad and liberal treatment.'") (*citing Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

### B.     There Are Only Three Narrow Circumstances Under Which An Attorney Can Instruct A Deponent Not To Answer A Question During A Discovery Deposition

Rule 30(c) governs how depositions are to be conducted.  *See* Fed. R. Civ. P. 30.  Rule 30(c)(2) specifically addresses permissible objections and how they must be made; with only *three narrow grounds* for counsel to use as a legitimate, good faith basis for "instructing a deponent not to answer":

An objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, but the examination still proceeds; *the testimony is taken*

5

*subject to any objection.* An objection must be stated concisely in a nonargumentative and nonsuggestive manner. *A person may instruct a deponent not to answer only when [1] necessary to preserve a privilege, [2]to enforce a limitation ordered by the court, or [3] to present a motion under Rule 30(d)(3).*

Fed. R. Civ. P. 30(c)(2) (emphasis added). *See* Wright & Miller, *Federal Practice and Procedure: Civil § 2113* at 419, n. 22 (1970) ("Counsel for party had no right to impose silence or instruct witnesses not to answer and if he believed questions to be without scope of orders he should have done nothing more than state his objections.");  23 Am. Jur. 2d *Depositions and Discovery* § 96 ("A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion to terminate or limit the deposition under the applicable provision of the Federal Rules of Civil Procedure.").

One of the central issues raised in the Joint Report of Discovery Disputes relates to Officer Starks and Assistant Chief Finks "refus[ing] to testify [during their deposition in this case] about certain issues arising from the related lawsuits and counsel for Fulk (who also represents Finks) intends to improperly direct the witness not to answer relevant questions involving those lawsuits." Plaintiff's Counsel later specifically states that Mr. Chris Burks, the attorney for Fulk and Finks in their lawsuit against Chief Humphrey, instructed Finks during his deposition *in this case* not to answer questions related to matters involved in his lawsuit against Chief

Humphrey.  It appears Mr. Burks gave this instruction *either* because he believed the question posed was not "relevant" or because it related to or touched on issues involved in Finks's lawsuit against Chief Humphrey.  *Nothing* in the Joint Report of Discovery Dispute suggests that Mr. Burks's instruction to Finks not to answer the question was based on one of the three narrow grounds stated in Rule 30(c)(2). Thus, this instruction by Mr. Burks was improper and represents conduct that can support sanctions. Fed. R. Civ. P. 30(d)(2) (authorizing courts to "impose an appropriate sanction . . . on a person who impedes, delays, or frustrates the fair examination of the deponent"); *Craig v. St. Anthony's Medical Center*, 384 Fed. Appx. 531, 532-533, 2010 WL 2802492 (8th Cir. July 19, 2010) (upholding monetary sanction where counsel instructed deponent not to answer questions without asserting a valid justification for doing so); *Hearst v. Goodway Marketing, Inc.*, 145 F.R.D. 59, 63-64 (E.D. Penn. November 17, 1992) (ordering sanctions where counsel instructed deponent not to answer questions on the ground that they were irrelevant.).[2]

---

[2] Rule 32 governs the use of depositions at trial.  Any objection to the "competence, relevance, or materiality of [deposition] testimony - is not waived by a failure to make the objection before or during the deposition, unless the ground for it might have been corrected at that time. Fed. R. Civ. P. 32(d)(3)(A).  Thus, if any of the attorneys in this case have questions about the relevancy of deposition testimony being elicited by the questions asked by opposing counsel, the proper time to raise them is in a pretrial motion *in limine* or during trial. To make sure all of the attorneys in this case understand my point, I will restate it: *Instructing a deponent not to answer a question posed during a discovery deposition is sanctionable conduct unless the instruction is based on one of the three narrow grounds stated in Rule 30(c)(2).*

**C.     The "Other Civil Lawsuits" Filed By Finks and Chief Humphrey Are Not A Legitimate Ground For Counsel To Instruct A Deponent In This Case Not To Answer Deposition Questions Because The Question Touches On Issues Involved In The "Other Civil Lawsuits"**

Without citing any legal authority, counsel for Finks argues that Ms. Walls's attorneys should *not* be allowed to pose any questions to Officer Starks and Finks that relate to issues that are involved in Finks's pending lawsuit against Chief Humphrey.   He further argues that all of the attorneys representing the other plaintiffs in Finks's lawsuit must be present for Finks's deposition in this case.   There is *no "other lawsuit" exception* in Rule 32 which authorizes an attorney to instruct his client not to answer a question posed during a discovery deposition because it implicates issues and matters that may be relevant in other pending lawsuits, much less that all of the attorneys involved in the "other lawsuit" must be present at the deposition when the deponent is asked those questions.[3]

---

[3] During the deposition of Finks, it appears Mr. Burks instructed Finks, his client, *not* to answer questions about "other lawsuits."  If true, Mr. Burks violated Fed. R. Civ. P. 30(c)(2).  Mr. Burks's subjective belief that the questions were "irrelevant" or might touch on issues also relevant in Finks's pending lawsuit against Chief Humphrey provided him with *no legal basis whatsoever* for instructing his client not to answer the questions posed by Ms. Walls's attorneys.  *In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 618 (D.Nev. 1998) ("If irrelevant questions are asked, the proper procedure is to answer the questions, noting them for resolution at pretrial or trial.").  In a discovery deposition, it is serious and sanctionable conduct for an attorney to instruct his client not to answer a question unless one of the three previously discussed narrow exceptions apply under Fed. R. Civ. P. 30(c)(2).

Mr. Burks and all of the other attorneys in this case are now on notice that sanctions will be imposed against them, personally, if in future depositions they instruct their client not to answer a question on any ground other than the three narrow ones specified in Fed. R. Civ. P. 30(c)(2).

These arguments by Mr. Burks are made from whole cloth and do not pass the straight face test.  They should never again be raised in a deposition as a ground for instructing a witness not to answer a question.  If they are, sanctions will be imposed.

**D.      After Balancing The Factors In Rule 26(b), I Conclude The *Monell* Discovery Plaintiff Is Pursuing Is Reasonable And Can Proceed**

Plaintiff's *Monell* claim challenges allegedly unconstitutional policies, practices, customs, and training enacted or implemented by the LRPD and the City. According to Plaintiff, those policies, practices, customs, and training, either as enacted or as implemented and applied, led to the death of Mr. Blackshire.

The nature of this *Monell* claim supports and requires *broader discovery* into how the LRPD has gone about, over time, developing the policies, practices, customs, and training that govern how, when, and against whom LRPD officers use deadly force.  *Monell* claims that turn on proving a custom or practice or a failure to train always involve a fact-intensive inquiry into other similar instances or cases which go toward proving the prevalence of the customs and practices, as well as the duration and extent of any failures in training.  *See  Mick v. Raines*, 883 F.3d 1075, 1079, 1080 (8th Cir. 2015) (explaining that a plaintiff may prove an unofficial custom by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental

entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was a moving force behind the constitutional violation.") (omitting citation).

As a threshold matter, the City's generalized complaints about the high cost and burden of engaging in *Monell* discovery are *not* a proper basis for limiting discovery. *See e.g., Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *3 (N.D. Ill. Nov. 29, 2007) ("The City says it would have to produce 'thousands of documents' . . . but that sort of non-specific assertion of burden is routinely rejected as a basis to deny or limit discovery under Fed. R. Civ. P. 26(b)(2)(C)(iii)).

Defendants make the conclusory assertion that violation of department policy is "not a basis for liability."  Of course, in this case, that assertion in no way fairly characterizes the *Monell* claims Ms. Walls is alleging against the City.  Ms. Walls is making the most serious kind of *Monell* claim that challenges the constitutionality of the City's policies, practices, customs, and training, as they were enacted and as they were applied, which allegedly controlled how the City's police officers went about deciding when, how, and against whom they were permitted to use deadly force.  According to Ms. Walls, those policies, practices, customs, and training contributed to and caused the death of Mr. Blackshire.

Based on newspaper accounts of the incident, which appear to be supported by a widely circulated video of what took place, Officer Starks rolled onto the hood of Mr. Blackshire's slow moving vehicle and then fired all of the rounds in the high capacity magazine of his pistol through the windshield at Mr. Blackshire, from point blank range. It is possible Judge Fox may have relied on those facts to support his opinion that Officer Starks's actions "grossly deviated" from LRPD policy.

While Judge Fox's opinion about Officer Starks's actions seems to suggest that he will have a hard time defending against the personal liability claims Ms. Walls has asserted against him, it in no way supports the City's apparent belief that this also means its use of force policy, as enacted and as applied, must be deemed to be "constitutional" *in this case*. Judge Fox expressed *no opinion* regarding the constitutionality of the City's use of deadly force policy or any of the other *Monell* claims Ms. Walls is now asserting against the City. Furthermore, even if he did, it would not be admissible evidence in this case; it would carry no evidentiary weight, and it would carry no legal weight or be of any precedential value.

Defendants' reliance on *San Francisco v. Sheehan*, 575 U.S. 600, 135 S.Ct. 1765 (2015), the only case they cite, is misplaced. In *Sheehan*, the Court held that two police officers, who shot a mentally ill woman, were entitled to qualified immunity and could not be held *personally liable* for the plaintiff's injuries. The

11

Court noted that, even if the officer who used deadly force acted "contrary to her training," she was still entitled to qualified immunity. *Id.*, 135 S.Ct. at 1777.

First, the determination of whether a defendant is entitled to qualified immunity turns on the specific facts in each case. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)) (qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition."); *see also Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (citations omitted) ("[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, . . . [given that] police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."). Suffice it to say, the facts in *Sheehan* do not appear to have much in common with the facts of this case.

Second, the doctrine of qualified immunity protects individual officers from liability, *not* municipalities who are sued under *Monell*. *Connick v. Thompson*, 131 S.Ct. 1350 (2011); *Pearson v. Callahan*, 129 S. Ct. 808, 822 (2009).

The Court also rejects Defendants contention that it would be "disproportional" to the discovery of "meaningful information" to require them to answer questions related to earlier incidents "going back to the service of Chief Lawrence Johnson in 2000-2005." Defendants fail to explain *why* potentially relevant facts related to similar incidents from that time are not relevant to her

*Monell* claim.  For example, if during that timeframe the City followed the same or similar policies, practices, customs, and training as they followed at the time of Mr. Blackshire's death, similar incidents during that time period clearly would be relevant.  Accordingly, Ms. Walls's attorneys can question deponents to determine if they have any knowledge of similar uses of deadly force incidents that took place, between 2000 and 2005, but only if there is a proper foundation for those questions based on Plaintiff's counsel having established that, in connection with those similar incidents, the LRPD was following similar policies, practices, customs, and training governing when, how, and against whom its officers could use deadly force.

### III.  CONCLUSION

Rule 26(b) authorizes attorneys to engage in broad discovery to develop all of the facts that may be relevant to their respective claims and defenses.  To date, *nothing* Defendants' counsel has raised suggests that Plaintiff's counsel is pursuing any discovery that is outside the scope of Rule 26(b).  All future depositions, beginning with the one scheduled for Monday, November 16, must be conducted in accordance with this Order. I am available by telephone to resolve, *on the spot*, any future disputes that may arise as depositions continue in this case.  To avoid wasting everyone's time, counsel for all parties should understand and expect that my rulings on any future discovery disputes will be *consistent with* the ones I have made in this Order.

IT IS THEREFORE ORDERED THAT:

1.     All of Defendants' arguments to limit and restrict the questions posed by Plaintiff's counsel during the discovery depositions taken to date are without merit.

2.     All previously deposed individuals who were instructed not to answer questions by Mr. Burks or other lawyers, on any grounds not specified in Rule 30(c)(2), must provide full and complete answers to those questions. Plaintiff's counsel has the right to reopen those depositions and ask those questions again, and the deponent must answer those questions fully and completely.

3.     During upcoming depositions, counsel may contact my chambers at (501)604-5236 and request me to rule on any discovery disputes.  Counsel is responsible for ensuring that the court reporter for the deposition also transcribes the entire discovery colloquy between counsel and the Court, including my rulings, and then provides the Court with an official transcript of that portion of the deposition, which is certified to be true and correct.[4]

---

[4] Normally, I would use one of this Court's reporters to separately transcribe any discovery disputes that may arise during future depositions.  As a concession to the pandemic and to protect the health of our court reporters, I believe it is prudent to depart from our normal practice and have the parties' court reporter transcribe for me that portion of the deposition that is relevant to the resolution of any such discovery disputes that may arise.

After it has been officially transcribed and sworn to be true and correct, the relevant portion of the deposition related to the resolution of the discovery dispute should be mailed to the Clerk of Court for the Eastern District of Arkansas so that it can be filed in this case.

15

DATED this 12th day of November, 2020.


_____
UNITED STATES MAGISTRATE JUDGE